

FILED
Mar 31 2015, 9:32 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS

Adam J. Sedia
Rubino, Ruman, Crossmer & Polen
Dyer, Indiana

ATTORNEYS FOR APPELLEES

John P. Reed
Jonathan Halm
Abrahamson, Reed & Bilse
Hammond, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

County of Lake and the Lake
County Plan Commission,

*Appellants-Plaintiffs,*

v.

Alan J. Pahl and Roderick Pahl,

*Appellees-Defendants.*

March 31, 2015

Court of Appeals Case No.
45A03-1406-PL-214

Appeal from the Lake Superior Court

The Honorable Thomas W. Webber,
Sr., Senior Judge

Cause No. 45D04-1208-PL-78

**Brown, Judge.**

County of Lake ("Lake County") and the Lake County Plan Commission (the "Plan Commission," and collectively with Lake County, the "Appellants") appeal the trial court's finding in favor of Alan J. and Roderick Pahl[1] (collectively the "Appellees") and raise two issues, which we revise and restate as whether the trial court erred by denying the Appellants' request for an injunction or abused its discretion by denying the Appellants' motion to correct error. We reverse and remand.

## Facts and Procedural History

In 2006, the Appellees purchased a certain 10.08 acre parcel of land located in Lowell, Indiana (the "Property"), which comprises Lot 5 of Westerhoff Acres, a five-lot subdivision. The land is situated in an area of Unincorporated Lake County that was first zoned by Lake County in 1957 as part of its Comprehensive Plan and Zoning Ordinance. From the enactment of the 1957 Zoning Ordinance through June 13, 1995, the Property was zoned A-1, which established its classification as an agricultural zone. Its zoning classification was changed in the summer of 1995 to R-1, single family residential, in order to develop Westerhoff Acres.

Kimberly Pahl, who sometime after the purchase married Alan, was interested in purchasing land for agricultural purposes. Alan and Kimberly (collectively "the Pahls") found a realtor's listing for the Property, which indicated that it

---

[1] Roderick Pahl, who is the father of Alan Pahl, was a co-signer on the loan used to acquire the land; however, he does not live on the Property and is not involved with the activities that have led to this appeal.

was zoned "Ag-Res." Defendants' Exhibit 1 at 2. The Pahls reviewed a real property maintenance report issued by the Lake County Assessor's Office on its website, which, under "Parcel Type," indicates "101 AG – Cash Grain/General Farm," but the Pahls did not go to or check with the Plan Commission on the Property's zoning classification. Defendants' Exhibit 6 at 3.

[4] When the Pahls purchased the Property, corn and soybean stubble from the prior year's harvest was visible on the Property. The purchase agreement, dated January 1, 2006, provided that "[a]ll crops planted upon the Property prior to 12/30/05 shall belong to the Seller . . . . All other crops belong to the Purchaser." Defendants' Exhibit 4 at 1. In the spring of 2006, the Pahls began to construct a home, which took eight months to complete, and, while construction was ongoing, farming activity on the Property ceased.

[5] Around May 2008, the Pahls first brought alpacas onto the Property. Kimberly keeps a variety of animals there, including chickens, ducks, rabbits, riding horses, mini horses, alpacas, and goats. The Pahls' nearest neighbor, from the back of that neighbor's house, is about 50 to 80 feet from the Pahls' property line, and other neighbors' lots are anywhere from 100 to 600 feet away from the Property. The Pahls sell the ducklings, the goats are used for both recreational and commercial purposes, and the alpacas are raised for their fiber and manure. Kimberly sends the alpaca fiber to a mill in trade for a finished product, but

sometimes she sells it directly to spinners or uses part of the fiber in her own products that she makes for sale.[2]

[6] In October 2009, the Pahls received a letter from the Plan Commission notifying them that they were in violation of the Unincorporated Lake County Zoning and Planning Ordinance (the "Zoning Ordinance") because they were keeping alpacas on the Property. After receiving the letter, Alan contacted Rick Niemeyer,[3] who informed Alan that he had previously known the couple kept alpacas after receiving an earlier complaint and, once Niemeyer received a second complaint regarding the alpacas, he forwarded that complaint to Robert Bauer, a code enforcement officer on the Plan Commission, who then took action. The next day the Pahls contacted Bauer to determine how to remedy the violation. At some point after the receipt of the letter notifying them of their violation under the Zoning Ordinance, the Pahls filed two petitions for a variance with the Lake County Board of Zoning Appeals (the "BZA"), one to operate as a hobby farm and the other to build an accessory building.

[7] On March 17, 2010, the Pahls withdrew their petitions when they discovered, through the Indiana Department of Agriculture and the Indiana Farm Bureau, that their Property might qualify as an agricultural nonconforming use under

---

[2] According to the Pahls' tax records, they reported a net loss of $3,586.00 in 2008 and a net loss of $13,541.00 in 2009 from their Schedule F, "Profit or Loss From Farming" returns, along with $1,084.00 in depreciation in 2008 and $7,940.00 in depreciation in 2009 on their Form 4562 "Depreciation and Amortization" for those years.

[3] The record does not reveal the position or job title that Niemeyer held with Lake County.

Ind. Code § 36-7-4-616, which, in general, provides protection for the use of land for agricultural purposes in an area where such use would not be permitted by the applicable zoning ordinance. As a result, the Pahls, through their attorney, notified the BZA that they did not wish to proceed on their variance petitions. On May 27, 2010, the Pahls received a letter from Bauer again indicating that they were in violation of the Zoning Ordinance and that the matter would be turned over to Lake County's attorney for legal action.

[8] In October 2011, Alan applied to the Plan Commission for a permit to build a barn on the Property. Ned Kovachevich, Executive Director of the Lake County Planning and Building Department, informed Alan that, under the Zoning Ordinance, the proposed barn was too large based on the lot's size and residential zoning classification.

[9] On August 28, 2012, the Appellants filed a complaint for injunctive relief against the Pahls alleging that their use of the Property constituted agricultural use, that the Property was located in a residential subdivision, and that the Property did not qualify as a hobby farm, all in violation of the Zoning Ordinance. Specifically, the complaint alleged that raising alpacas in excess of the number allowed per acre in a residential zone, constructing "illegal temporary structures," constructing "accessory buildings and sheds without the benefit of acquiring the necessary building permits," and conducting "business in a residential zone" on the Property violated the Zoning Ordinance. Appellants' Appendix at 17. The Appellants sought injunctive relief and the removal of the alpacas, and the removal of "the illegal temporary structures"

including the "commercial semi-trailer being used for storage, any buildings and/or mobile homes" or, in the alternative, requested that the Pahls "apply for and obtain the proper building permits for the construction or maintaining of the illegally constructed buildings, sheds, and/or mobile homes." *Id.* The Appellants also sought to "bring the property into compliance with all rules and regulations of the Unincorporated Lake County Zoning, Planning and Building Ordinances," to prevent the Pahls from "conducting business operations in a residential zone," to stop "increasing the extent of the violations" under the Zoning Ordinance, and to bring the Property "into full compliance with the applicable zoning district." *Id.* at 17-18. On October 18, 2012, the Pahls filed an answer which denied the relevant allegations in the complaint and pled, as affirmative defenses, duress, estoppel, illegality, laches, lack of jurisdiction over the subject matter, and failure to state a claim upon which relief can be granted.

[10] On March 3, 2014, the court conducted a bench trial, at which the parties presented testimony and exhibits consistent with the foregoing. At the outset, the Appellants' counsel argued "[w]e're alleging that there's some violations with the number of animals and keeping animals on the property and some buildings without proper permitting." Transcript at 3. The Appellees' counsel argued that "[w]hat we think we have here is a statutory defense to the County's imposition of its present zoning code subdivision ordinance upon us by an overriding state statute, [Ind. Code § 36-7-4-616], that controls the ongoing practice of agriculture on [the Property]." *Id.*

[11]     At the trial, Kimberly testified that in January 2006 she had a conversation with Bauer about whether the couple could use the Property for both agricultural and residential uses, specifically whether they could keep alpacas and horses, to confirm the information related to them by a real estate agent concerning the Property's suitability for agricultural uses, and that Bauer did not provide any negative information to those questions. Kimberly stated that there had not been a three-year period in any five-year stretch when the Property had not been farmed or put to an agricultural use. She further testified that she kept "approximately 28 alpacas . . . two riding horses, four minis, some chickens, some ducks, and four pigmy goats" on the Property. *Id.* at 39. She clarified that she had about "two dozen" chickens and "about a dozen ducks." *Id.* at 40. She also stated that she had applied for a barn permit, which she did not receive, and that the Plan Commission would not accept her application for a fence permit. She further testified that the inability to build a barn proved dangerous for the animals during the winter time and that "[a]bout 20" alpacas "froze to death" during the 2013 winter. *Id.* at 61. When asked whether the alpacas would have frozen to death if there had been a proper barn, she responded, "[n]o." *Id.*

[12]     On cross-examination, Kimberly testified that she looked online to determine but did not understand that, at the time of the purchase, the Property was located in a residential zone. She testified that her conversation with Bauer "was about whether or not I was able to use [the Property] as [sic] agricultural purposes," that she was never "presented with the zoning maps no matter how

many times I went to the County and inquired about" the Property, and that she was unsure as to whether the Property was, in fact, located in a subdivision. *Id.* at 68. As to Kimberly's efforts to ascertain whether the Property was in a subdivision or was agricultural, she testified that "I inquired to the Assessor's Department the claims that the County had made in 2009 whether I was in a subdivision or not, and I was told, no, I was not" but was "told something different" regarding the land's zoning classification when she inquired at the Plan Commission. *Id.* at 69. She also testified that she had seen Lake County's ordinance book and was aware that the minimum acreage to be considered a farm under the Zoning Ordinance was twenty acres and acknowledged that the Pahls' lot was only 10.08 acres. She stated that she did not have a permit for the temporary structures, and did not have permits for the accessory buildings. Regarding the fences, Kimberly testified that she "was told [she] did not need [a permit]" for the fences, but admitted that she lacked a permit for the fencing. *Id.* at 76. She also indicated that she was running a business, Blumenau Alpacas, in a residential zone, but she was losing money for tax purposes. Kimberly further testified that she sends fiber from the alpacas to mills and sells the finished products through the internet, at events, or through word of mouth. She also explained a shearer "comes in once a year" and that "[o]ccasionally" a transport truck will come to the Property. *Id.* at 77

[13]     Kovachevich testified that in 2006 the Property was zoned R-1 and that R-1 zoning "is our most restrictive residential zone." *Id.* at 101. He stated that keeping animals, with the exception of dogs and cats, is not allowed in an R-1

zone. Kovachevich testified that the Zoning Ordinance allows for hobby farms, which are "allowed in all zoning districts" and "completely defines exactly where and how many animals would be permitted in a subdivision," and he indicated that a hobby farm is not permitted in a subdivision unless eighty percent of the platted lots are at least five acres in size. *Id.* at 106. When asked whether the Pahls' lot qualified as a hobby farm, Kovachevich responded "[n]o," and he added that, other than dogs and cats, "[t]here are no animals [] allowed" on the Property. *Id.* at 107. Kovachevich also stated that business operations are not allowed in an R-1 zone, unless the individual applies for a variance. As to the temporary structures, Kovachevich testified that temporary structures "are categorically not allowed" and that "[y]ou can't get a building permit for a temporary structure." *Id.* at 111. He also indicated that, absent permits, the temporary structures and accessory buildings, including lean-tos and other sheds, were on the Property illegally. Regarding fences, Kovachevich explained that "an agricultural fence, [] does not require a building permit, but it's a very small split rail" and that the fencing on the Pahls' Property "would require building permits." *Id.* at 114. He added that "there are certain qualifications . . . under the zoning ordinance that people must meet, and then there are other requirements under the building code that are . . . different. . . . but [building and zoning permits] basically are issued in conjunction with each other." *Id.* at 118.

[14] During cross-examination of Kovachevich, the following exchange occurred:

> [Appellants' Counsel]: We stipulate that evidence has been presented that shows [the Property] was farmed up to the date of purchase, but we have no further comment on opposing evidence.
>
> The Court: We'll show that Lake County stipulates that the [P]roperty was farmed up to the date of purchase.
>
> [Appellees' Counsel]: Okay.

*Id.* at 129. Kovachevich then testified that, as to the Comprehensive Plan itself, the Property "was always – to my knowledge, it was always considered targeted for agricultural uses." *Id.* at 131.

[15] Bauer testified that it was his opinion that the Property was in violation of the Zoning Ordinance, and the violations had been occurring since approximately 2009. Photographs of the animals taken around October 2013, of the temporary structures taken around September 20, 2011, and of lean-tos and a fence taken on April 7, 2011 were admitted as evidence of the violations occurring on the Property.

[16] Alan testified that he "personally went in for the barn permit," and that the permit application was not accepted because of "what they're calling temporary structures, which are shelters for the animals, they weren't drawn on there. And I told him we didn't draw them on there because once I get the barn permit, all those so-called temporary structures will be removed." *Id.* at 147-148. He further testified that Lake County's "permit applications have two boxes; one is agriculture, one says residential . . . . we would not check the box that says residential because of this lawsuit going on" and that Lake County

would not "accept [the permit application] if it was checked agricultural because it's the County's position that we're residential." *Id.* at 150. On cross-examination, Alan stated that he did not go to the Plan Commission to check on the existing zoning when he first purchased the Property, that he did not check with the realtor to determine whether the Property was suitable for agriculture, and that further investigation "never crossed my mind. [The Property] was deemed farmed." *Id.* at 157. Regarding other public documents indicating the Property was located on agricultural land, Alan testified that he was not aware of "any sort of discrepancy between different offices and the County to where they would tax you different than what the land was," and his understanding was "that we were buying some A[-]1 farm property and we could do what we wanted to do. We could live the dream." *Id.* at 158.

[17] On April 10, 2014, the court entered a judgment in favor of the Appellees along with findings of fact and conclusions thereon. The court found that the Property is located in unincorporated Lake County, is currently zoned residential, and is located in a platted subdivision within Lake County, which was rezoned in the summer of 1995. It further found that the Property had been "consistently and openly" used for "agricultural purposes, without a lapse of more that [sic] several months," that the animals, including alpacas, goats, chickens, ducks, horses, mini horses, and other miscellaneous farm animals on the Property "can be found in the definition of 'Livestock', as that term is defined in Indiana Code 15-11-5-1(4), (5), (6), and (8)," and that "no countervailing evidence was presented to suggest that there had been any lapse

in agricultural operations on the subject property of more than several months." Appellants' Appendix at 9. The court also found that Lake County has had in place a Comprehensive Plan since 1957 and that the Property had been "classified for 'agricultural use' in the Comprehensive Plan" from the plan's inception through the date of the trial. *Id.* at 10. The court concluded that the Property "falls under I.C. 36-7-4-616(b)(2). That is to say, because the land was subject to a 'Comprehensive Plan' prior to the rezoning and subdividing of the land for residential purposes, the subject property does not fall under the definition provided in I.C. 36-7-4-616(b)(1) . . . ." *Id.* at 11. The order further stated that, under subsection (f) of the statute Lake County had the authority to "require an agricultural nonconforming use to be maintained and operated in compliance with all: (1) state environmental and state health laws and rules; and (2) requirements to which conforming agricultural use land is subject under the county's comprehensive plan or zoning ordinance." *Id.* at 12.

[18] On May 6, 2014, the Appellants filed a Motion To Correct Errors, in which they argued that the trial court "failed to consider the semi-trailers on the Property and the Pahls' failure to obtain permits before erecting temporary structures and fencing and operating a business on the Property" and that the trial court "erroneously interpreted I.C. 36-7-4-616 by failing to consider the Property's failure to meet the criteria for agricultural use set forth in the Ordinance." Appellees' Appendix at 34. On June 4, 2014, the Appellees filed a Statement In Opposition to Plaintiffs' Motion To Correct Error, in which they contended that "Lake County's allegations do not request relief based upon

agricultural zoning of the subject property," and that "Lake County's allegations all presume that the subject property is zoned strictly for residential purposes." *Id.* at 42. The court denied the Appellants' Motion To Correct Errors without a hearing on June 11, 2014.

### *Standard of Review*

[19] The issue is whether the trial court erred in denying the Appellants' request for an injunction, or abused its discretion in denying the Appellants' motion to correct error. A party who had the burden of proof at trial appeals from a negative judgment and will prevail only if it establishes that the judgment is contrary to law. *Hoose v. Doody,* 886 N.E.2d 83, 89 (Ind. Ct. App. 2008), *trans. denied.* A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion. *Id.* Also, a party pleading an affirmative defense has the burden of proving an affirmative defense by a preponderance of the evidence. *Lacy v. White*, 153 Ind. App. 504, 515, 288 N.E.2d 178, 185 (1972). An affirmative defense is a defense upon which the proponent bears the burden of proof and which, in effect, admits the essential allegations of the complaint, but asserts additional matter barring relief. *GKC Indiana Theatres, Inc. v. Elk Retail Investors, LLC*, 764 N.E.2d 647, 653 (Ind. Ct. App. 2002).

[20] The grant or denial of an injunction is discretionary, and we will not reverse unless the trial court's action was arbitrary or constituted a clear abuse of discretion. *Dierckman v. Area Planning Comm'n of Franklin Cnty., Ind.*, 752

N.E.2d 99, 104 (Ind. Ct. App. 2001), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances or if the trial court misinterprets the law. Id. A party seeking an injunction for a zoning violation must prove: (1) the existence of a valid ordinance and (2) a violation of that ordinance. *Id.*

[22] The trial court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage-MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind. 2000), *reh'g denied*. In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996).

[22] When a trial court accepts verbatim a party's proposed findings of fact and conclusions thereon, that practice "weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court." *In re Marriage of Nickels*, 834 N.E.2d 1091, 1096 (Ind. Ct. App. 2005) (quoting *Cook v. WhitsellSherman*, 796 N.E.2d 271, 273 n.1 (Ind. 2003)). It is not uncommon or per se improper for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. *Id.* at 1095. Although we by no means encourage the wholesale adoption of a party's proposed findings and conclusions, the critical inquiry is whether such findings, as adopted by the court, are clearly erroneous. *Id.* at 1096.

A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999). Specific findings control only as to the issues they cover, and a general judgment standard applies to issues upon which the trial court made no findings. *In re Guardianship of Phillips*, 926 N.E.2d 1103, 1107 (Ind. Ct. App. 2010)*; Rea v. Shroyer,* 797 N.E.2d 1178, 1181 (Ind. Ct. App. 2003). We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Kwolek v. Swickard*, 944 N.E.2d 564, 570 (Ind. Ct. App. 2011) (citing *McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*), *trans. denied*.

We generally review rulings on motions to correct error for an abuse of discretion. *Ind. Bureau of Motor Vehicles v. Charles*, 919 N.E.2d 114, 116 (Ind. Ct. App. 2009); *Speedway SuperAmerica, LLC v. Holmes*, 885 N.E.2d 1265, 1270 (Ind. 2008), *reh'g denied*. An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before it, or the reasonable inferences drawn therefrom. *Lighty v. Lighty*, 879 N.E.2d 637, 640 (Ind. Ct. App. 2008), *reh'g denied*.

## Parties' Arguments

The Appellants first argue that the trial court failed to apply subsection (f) of Ind. Code § 36-7-4-616(f) and interpreted "subsection (e)(1) as a total bar on Lake County's zoning enforcement power" over the Property. Appellants' Brief at 10. The Appellants assert that the trial court's reading of the statute yields "absurd economic and social results" because "any agricultural use on land later subdivided and developed can continue in perpetuity as long as it does not lapse for longer than three out of five years, regardless of the type of activity or size of the lot." *Id.* at 12. The Appellants argue that Section 2.7(G) of the Zoning Ordinance "prohibits keeping livestock on properties less than twenty acres, unless the property is a hobby farm," that the agricultural nonconforming use statute does not give the Pahls "free reign to engage in unlimited agricultural pursuits," and that subsection (f) "limit[s] the Pahls only to those pursuits that d[o] not violate the Zoning Ordinance." *Id.* at 13. The Appellants further contend that the trial court issued "defective findings and conclusions" and maintain that the Pahls must still comply with the structure requirements outlined in the Zoning Ordinance. *Id.* at 14. More specifically, the Appellants note that the trial court "focused only on the keeping of the livestock on the Property, and issued no findings concerning the semi-trailers, the lean-to shed, the fencing, the Pahl[s'] failure to secure permits, or the nature and extent of their business." *Id.* at 15 (citing Appellants' Appendix at 9-10). Consequently, the Appellants maintain that the trial court's findings and conclusions were clearly erroneous.

The Appellees maintain that the statute should be read as a whole and that the trial court did not err when it determined that Ind. Code § 36-7-4-616 applied to their use of the Property. The Appellees assert that "Lake County waived any argument regarding the application of § 36-7-4-616(f) and Lake County Zoning Ordinance § 2.7(G)" by not providing its "preferred interpretation" of the statute to the trial court, and that, waiver notwithstanding, "at common law nonconforming uses are disfavored, but there is no principle of law that requires the Court to disfavor agricultural nonconforming uses" in reading the statute. *Id.* at 21-22. The Appellees maintain that the Zoning Ordinance does not cover buildings and land incidental to agricultural operations and point to Section 2.3 of the Zoning Ordinance, which provides that "[n]o building or land, except buildings or land incidental to agricultural operations, shall hereafter be used, and no building or part thereof shall be erected, moved, or altered, unless in conformity with the regulations of this Ordinance," and they assert that if the Ordinance covers "agricultural operations, then it is in many respects in direct conflict with the statute." *Id.* at 22-23 (citing Appellees' Appendix at 72). The Appellees say that Lake County is without the authority to define a farm as "any parcel of land at twenty acres in size used for agricultural purposes," because the statute provides that "there can be no termination or restriction" of an agricultural nonconforming use, that the definition of "farm" in the Zoning Ordinance "is not binding on the Court" as to the statute's meaning, that, under subsection (f), Lake County may "require agricultural nonconforming uses to be maintained and operated in the same manner as conforming agricultural uses," and that Lake County may not "limit application of the statute to parcels

of 20 acres or more" through subsection (f). *Id.* at 23-24. The Appellees further assert that the trial court's findings were not clearly erroneous and that the trial court "cannot be found to have erred on this issue [the lack of findings on buildings, structures, and fencing], which it never had the opportunity to consider." *Id.* at 25 (citing *Showalter v. Town of Thorntown*, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009)[, *trans. denied*.]). Additionally, they contend that Lake County asked the trial court "to rule that the Pahls must maintain their nonconforming agricultural use in the same manner as property zoned for residential use," rather than maintaining the Property in the same way as conforming agricultural use land, as provided by Ind. Code § 36-7-4-616(f). *Id.* Finally, the Appellees maintain that the court's findings regarding the structures and buildings on the Property "must be upheld if [they are] sustainable on any theory" and point to the language in Section 2.3 of the Zoning Ordinance, which, they say, exempts agricultural operations from the Zoning Ordinance.[4] *Id.* at 26.

[27] In their reply brief, the Appellants assert that they have not waived their arguments regarding the application of subsection (f), noting that they "make[] no argument on appeal different from what [they] raised to the Superior Court – namely, that the Zoning Ordinance applies despite the terms of I.C. 36-7-4-

---

[4] Section 2.3 of the Zoning Ordinance, titled "Buildings and Uses Affected by Zoning," provides that "[n]o building or land, except buildings or land incidental to agricultural operations, shall hereafter be used, and no building or part thereof shall be erected, moved, or altered unless in conformity with the regulations of this Ordinance." Appellees' Appendix at 72.

616(e). . . ." Appellants' Reply Brief at 2. Moreover, they assert that "subsection (f) renders the Zoning Ordinance applicable to the Property and permits Lake County to restrict the Pahls' protected agricultural nonconforming use." *Id.* Regarding the Appellees' argument that Lake County could not limit application of that statute to parcels of twenty acres or more, the Appellants note that the Legislature included language "expressly subjecting protected agricultural nonconforming use to Lake County's zoning power." *Id.* at 3. The Appellants also maintain that the Appellees are not exempt from the building requirements of the Zoning Ordinance simply because of their difficulties in obtaining permits for the "wheelless semi[-]trailers, lean-to, and fencing on the Property" and that the Appellees' arguments are premised on a "misreading of Section 2.3" of the Zoning Ordinance. *Id.* at 3-4.

### *Analysis*

We review an issue of statutory interpretation *de novo*. *Chrysler Grp., LLC v. Review Bd. of Ind. Dep't of Workforce Dev.*, 960 N.E.2d 118, 124 (Ind. 2012). Where, as here, a statute has not previously been construed, the express language of the statute controls the interpretation, and the rules of statutory construction apply. *Bushong v. Williamson*, 790 N.E.2d 467, 471 (Ind. 2003). "Clear and unambiguous statutes leave no room for judicial construction." *Basileh v. Alghusain*, 912 N.E.2d 814, 821 (Ind. 2009). But when a statute is susceptible to more than one interpretation it is deemed ambiguous and thus open to judicial construction. *Id.* If the statutory language is clear and unambiguous, we require only that the words and phrases it contains are given

their plain, ordinary, and usual meanings to determine and implement the legislature's intent. *State v. Am. Family Voices, Inc.*, 898 N.E.2d 293, 297 (Ind. 2008), *reh'g denied*.

[29] Similarly, we observe that the interpretation of a zoning ordinance is a question of law that is reviewed *de novo*. *Story Bed & Breakfast LLP v. Brown Cnty. Area Plan Comm'n*, 819 N.E.2d 55, 65 (Ind. 2004). The ordinary rules of statutory construction apply in interpreting the language of a zoning ordinance. *Id.* Words are to be given their plain, ordinary, and usual meaning, unless a contrary purpose is shown by the statute or ordinance itself. *Hall Drive Ins. Inc. v. City of Fort Wayne*, 773 N.E.2d 255, 257 (Ind. 2002). Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the ordinance. *Id.* Furthermore, zoning regulations that inhibit the use of real property are in derogation of the common law and are strictly construed. *Flying J., Inc. v. City of New Haven Bd. of Zoning Appeals*, 855 N.E.2d 1035, 1039 (Ind. Ct. App. 2006), *reh'g denied*, *trans. denied*. The courts construe a zoning ordinance to favor the free use of land and will not extend restrictions by implication. *Id.*

[30] Ind. Code § 36-7-4-616, titled "Zoning ordinance; agricultural nonconforming use," provides:

> (a) The definitions used in this section apply only to this section.
>
> (b) As used in this section, "agricultural use" refers to land that is used for:

(1) the production of livestock or livestock products, commercial aquaculture, equine or equine products, land designated as a conservation reserve plan, pastureland, poultry or poultry products, horticultural or nursery stock, fruit, vegetables, forage, grains, timber, trees, bees and apiary products, tobacco, or other agricultural crops, in the case of land that was not subject to a comprehensive plan or zoning ordinance before the most recent plan or zoning ordinance, including any amendments, was adopted; or

(2) agricultural purposes as defined in or consistent with a comprehensive plan or zoning ordinance that:

> (A) the land was subject to; and

> (B) was repealed before the adoption of the most recent comprehensive plan or zoning ordinance, including any amendments.

(c) As used in this section, "agricultural nonconforming use" means the agricultural use of land that is not permitted under the most recent comprehensive plan or zoning ordinance, including any amendments, for the area where the land is located.

(d) An agricultural use of land that constitutes an agricultural nonconforming use may be changed to another agricultural use of land without losing agricultural nonconforming use status.

(e) A county or municipality may not, through the county or municipality's zoning authority, do any of the following:

> (1) Terminate an agricultural nonconforming use if the agricultural nonconforming use has been maintained for at least any three (3) year period in a five (5) year period.

> (2) Restrict an agricultural nonconforming use.

> (3) Require any of the following for the agricultural nonconforming use of the land:

> > (A) A variance for the land.

(B) A special exception for the land.

(C) A special use for the land.

(D) A contingent use for the land.

(E) A conditional use for the land.

(f) Notwithstanding subsection (e), this section does not prohibit a county, a municipality, or the state from requiring an agricultural nonconforming use to be maintained and operated in compliance with all:

(1) state environmental and state health laws and rules; and

(2) requirements to which conforming agricultural use land is subject under the county's comprehensive plan or zoning ordinance.

[31] To the extent the Appellees assert that Lake County has waived its arguments regarding the application of subsection (f) and Section 2.7(G) of the Zoning Ordinance, we observe that "[a] party generally waives appellate review of an issue or argument unless the party raised that issue or argument before the trial court." *GKC Ind. Theatres, Inc.*, 764 N.E.2d at 652. The Indiana Supreme Court has recently observed:

> The rule that parties will be held to trial court theories by the appellate tribunal does not mean that no new position may be taken, or that new arguments may not be adduced; all that it means is that substantive questions independent in character and not within the issues or not presented to the trial court shall not be first made upon appeal. Questions within the issues and before the trial court are before the appellate court, and new arguments and authorities may with strict propriety be brought forward.

*Moryl v. Ransone*, 4 N.E.3d 1133, 1136 (Ind. 2014) (quoting *Bielat v. Folta*, 141 Ind. App. 452, 454, 229 N.E.2d 474, 476 (1967)).

[32] Lake County stated at the outset of the hearing before the trial court that it was "alleging various violations of the zoning ordinance . . . ." Transcript at 2. Lake County also argued that the Appellees' reliance on Ind. Code § 36-7-4-616 was "irrelevant and misconstrued as to how it applies to subdivided property." *Id.* at 4. Implicit in Lake County's opening comments is the idea that the Zoning Ordinance applies to the Property, and the statute expressly provides that agricultural nonconforming uses are subject to a county's comprehensive plan or zoning ordinance. Consequently, we find that the Appellants have not waived their arguments related to Ind. Code § 36-7-4-616(f) and Section 2.7 of the Zoning Ordinance. *See Moryl*, 4 N.E.3d at 1136.

[33] Even assuming that the Property here qualified as an agricultural use under subparagraph (b)(2) of the statute, which the statute requires before such use can be nonconforming under subsection (c), subsection (f) provides that "requirements to which conforming agricultural use land is subject under the . . . zoning ordinance" still apply. Ind. Code § 36-7-4-616(f)(2). The text is clear and unambiguous that the Legislature intended for subsection (f) to operate as a limitation on a landowner's right to exercise an agricultural nonconforming use expressed in subsection (e). When a statute is clear and unambiguous, we apply the rules of statutory construction and interpret statutory language in its plain, ordinary, and usual sense. *See Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 947 (Ind. 2001).

[34] Subsection (f)(2) renders Section 2.7 of the Zoning Ordinance, titled "General Use Provisions," applicable to the Property, whether or not the Property qualified to be treated as agricultural nonconforming use. Specifically, Section 2.7(G) of the Zoning Ordinance states that "[k]eeping, raising, or breeding of farm animals, including horses and ponies, or poultry shall not be permitted in any zone, except on farms of twenty (20) acres or more, or on hobby farms." Plaintiffs' Exhibit 3 at 23. The trial court heard testimony that the Pahls kept a substantial number of animals on their 10.08-acre lot, which the Zoning Ordinance prohibits on lots smaller than twenty acres. The record further reveals that the Pahls' lot would not have qualified as a hobby farm under the Zoning Ordinance, which would permit a landowner to keep a small number of animals in a subdivision because hobby farms are not permitted in subdivisions unless "80% of the platted lots are five (5) acres or more in size" and the four other lots in the subdivision, of which the Property is a part, are less than five acres. *Id.* at 93.

[35] To the extent the Appellees maintain that Section 2.3 of the Zoning Ordinance supports the conclusion that the Zoning Ordinance does not apply to buildings and land incidental to agricultural operations, we note that Section 5.0 of the Zoning Ordinance provides rules for agricultural and residential zones, and Section 5.1(C)(1) expressly cross-references other provisions of the Zoning Ordinance related to, among others, accessory buildings and fencing, for which permitting is required.

As to the wheelless semi-trailers, another of the "General Use Provisions" applicable to the Property, Section 2.7(F)(1), provides in relevant part, that "[n]o temporary buildings or structure shall be erected or reconstructed, enlarged or moved on any lot or placed on a tract of land . . . ."[5] *Id.* at 21. The trial court heard testimony indicating that the Pahls lacked permits for the wheelless semi-trailers, and, according to Kovachevich, that temporary structures "are categorically not allowed," because Lake County does not issue building permits for such structures, and those structures were on the Property illegally. Transcript at 111.

As for the lean-tos and sheds, we note that Section 5.1(C)(1) provides that the rules for accessory structures in Section 9.3 of the Zoning Ordinance apply to conforming agricultural use land. Section 9.3(C) of the Zoning Ordinance, titled "Accessory Buildings on One (1) Acre or More" provides rules for constructing additional buildings depending on the acreage of the property on which the building would be constructed, and, in conjunction with Section 10.1, titled "Permits," would appear to require an applicant to comply with the permit process before constructing an accessory building. Section 10.1(A) provides that "[n]o [b]uilding or [s]tructure . . . shall be erected, reconstructed,

---

[5] Section 2.7(F)(1)(b) allows, by special exception only, "one structure or building approved by the State of Indiana may be placed on a farm, twenty (20) acres or more, for the housing of transient workers on agricultural pursuits," and Section 2.7(F)(2)(b)(1) provides that "one (1) mobile home may be placed on a farm twenty (20) acres or more for the housing of permanent employees on full agricultural pursuits . . . ." Plaintiffs' Exhibit 3 at 21-22. Neither of these exceptions are applicable to the temporary structures on the Property.

enlarged, or moved until a Building and Zoning Permit shall have been applied for in writing and issued by the Commission Secretary, or his designated agent" and contains three exceptions detailing when permits are not required.[6] Plaintiffs' Exhibit 3 at 110. Also, Section 10.1(E) provides that a site plan must be submitted for "[e]very application for a Building and Zoning Permit" and "is intended to be applied to all Building and Zoning Permits except those for a main building . . . ." *Id.* at 111-112. The trial court heard testimony that the Appellees lacked the required permits to build the accessory buildings, which included lean-tos and sheds, on the Property.

[38] As to the fencing, we observe that Section 5.1(C)(1) of the Zoning Ordinance expressly provides that conforming agricultural use land is subject to Section 9.6, titled "Fences, Walls, and Shrubbery" and provides rules for farm and residential fences, and the Appellees lacked a permit for the fencing on the Property. Regarding the business activity on the Property, to the extent any business of the Appellees depended on selling animals, animal products, and manure, we have determined herein raising livestock is not permitted on the Property.

---

[6] The exceptions are for temporary swimming pools, children's recreational amusements, and one storage shed per residential lot. The storage shed is allowed "provided it is not placed on a permanent foundation, does not exceed 150 square feet in size, and provided it has no electrical service to it." Plaintiffs' Exhibit 3 at 110.

## *Conclusion*

[39] Based upon the record, we conclude that, in failing to apply subsection (f) and, by extension, the relevant provisions of the Zoning Ordinance to the Appellees' use of the land, the trial court erred in denying the Appellants' request for an injunction and abused its discretion in denying the Appellants' motion to correct error.

[40] For the foregoing reasons, we reverse the trial court's decision and remand with instructions to grant Lake County's petition for an injunction.

[41] Reversed and remanded.

Bailey, J., and Robb, J., concur.