# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision is not binding precedent for any court and may be cited only for persuasive value or to establish res judicata, collateral estoppel, or law of the case.



IN THE

# Court of Appeals of Indiana



FILED

Aug 19 2024, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Richard Brown and Janet Brown, Husband and Wife,

*Appellants-Plaintiffs*

v.

City of Valparaiso, Indiana,

*Appellee-Defendant*

---

August 19, 2024

Court of Appeals Case No.
23A-PL-2240

Appeal from the Porter Superior Court

The Honorable Michael A. Fish, Special Judge

Trial Court Cause No.
64D02-1501-PL-267

---

**Memorandum Decision by Judge Vaidik**
Judges May and Kenworthy concur.

**Vaidik, Judge.**

## Case Summary

[1] Richard and Janet Brown ("the Browns") appeal the trial court's judgment for the City of Valparaiso ("the City") on their inverse-condemnation claim. We affirm.

## Facts and Procedural History

[2] In 1973, the Browns built a house on a parcel of land in Valparaiso. The elevation of the house is about 795 feet above sea level. The backyard slopes downward to the east, with the lowest elevation of the property at around 792 feet in the northeast corner of the backyard.

[3] In 1987, the City constructed the Hotter Detention Facility ("the Hotter Facility") to store and control the downstream flow of stormwater. It includes a dam with a spillway at an elevation of 794.5 feet and additional storage up to the top of the dam at 796 feet. The facility was built to withhold a 100-year storm according to the design standard at the time.[1] It lies immediately east of the Brown property, and the common boundary between the two is at an elevation of 792.2 feet. Because the Hotter Facility is at a higher elevation than

---

[1] The term "one-hundred-year storm" means there is a "one percent chance . . . of that particular event happening in a given year." Tr. Vol. III p. 72. It does not mean the event "only happens once every hundred years." *Id.* at 73.

the Brown property, if stormwater accumulates at a sufficient volume beyond the dam's capacity, it will overflow onto the Brown property.

[4] During certain heavy rainfalls, water has accumulated in the northeast corner of the Browns' backyard. The Browns said this never occurred before the Hotter Facility was built. In September 2008, Valparaiso experienced a 200- to 500-year storm. As a result, water overflowed from the Hotter Facility onto the Brown property and into the lower level of the house. The Browns ended up with around one-and-a-half feet of water in their basement. The water receded after two to three days. This was the only time water ever entered the Brown's house.

[5] In November 2009, the Browns filed a complaint against the City alleging inverse condemnation, negligence, and deprivation of their civil rights under 42 U.S.C. § 1983 based on the damage to their property from the September 2008 storm ("First Complaint"). *See* Cause No. 64D01-0911-PL-11902. As to the inverse-condemnation claim, the Browns contended the overflow of water from the Hotter Facility onto their property constituted a taking. Following a bench trial in December 2012 on the inverse-condemnation claim only, the trial court denied the claim on the merits.[2] The court concluded the September 2008 storm

---

[2] The trial court here took judicial notice of the order from the 2012 bench trial and subsequent appeal. *See* Tr. Vol. II p. 20. The trial court in that case entered judgment for the City on the § 1983 claim. *See Brown v. City of Valparaiso*, No. 64A03-1308-PL-332, 2014 WL 1400198, at *1 (Ind. Ct. App. April 10, 2014) (mem.). After a trial on the negligence claim in 2018, a jury returned a verdict for the Browns in the amount of $102,322. *See* Appellants' Reply Br. p. 25; Cause No. 64D01-0911-PL-11902.

was the only time the Brown property flooded since the Hotter Facility was constructed, and that single flood did not rise to the level of a taking. *See* Ex. Z.

[6] In January 2015, the Browns filed a second inverse-condemnation claim against the City ("Second Complaint"). They alleged that, in addition to the September 2008 flood, there were two more "flooding episodes" in September 2013 and August 2014. Appellants' App. Vol. II p. 58. They also claimed there was "ponding" of water in the northeast corner of their property twice before September 2008, but they couldn't determine whether the water came from the Hotter Facility and didn't specify the dates of these occasions. *Id.* at 56.

[7] The City moved to dismiss the Second Complaint under Indiana Trial Rule 12(B)(8), arguing it was substantially similar to the First Complaint because they involved the same parties, subject matter, and remedies. The trial court granted the motion in August 2015, concluding the parties and subject matter of the complaints were substantially similar such that the determination of one would affect the outcome of the other, and that the remedies were similar enough that the Browns stood to be compensated twice. This Court reversed the dismissal, finding that the parties were the same but the subject matter and remedies were not. As to the subject matter, we explained that while the September 2008 flooding was a common underlying fact in both complaints, the First Complaint focused on the September 2008 flood exclusively, requesting damages for the flooding of the house, while the Second Complaint asserted the September 2008 flood in addition to the 2013 and 2014 floods as

evidence of a taking. *Brown v. City of Valparaiso*, No. 64A03-1601-PL-138, 2016 WL 6396105, at *8 (Ind. Ct. App. Oct. 26, 2016) (mem.).

[8] A bench trial on the Second Complaint was held in June 2023. In their testimony, the Browns alleged an additional flooding event in the backyard during a storm in February 2018 and clarified that the two events before September 2008 were in November 1990 and July 1996. Janet also claimed there were around six times when water gathered on the Brown property but receded within one day.

[9] The Browns described the effects of the alleged flooding events. They acknowledged that they've remained in their home continuously since the Hotter Facility was constructed and never had to move out because of water issues. They've maintained a little barn and garden in the backyard for over twenty years and maintained a vegetable garden for three years. They also hold an annual Easter egg hunt that hasn't been interrupted by any flooding event. Janet explained she had a trip planned in February 2018 but had to delay it for a couple of days because of that flooding event. She also noted that when there's water in the northeast corner of the property, they have to wait a day to mow the grass.

[10] The Browns presented photos allegedly showing water on their property from the flooding events, including the 2013, 2014, and 2018 events. The photos from the 2018 event were taken by Tim Burkman, former Valparaiso City Engineer, as part of his inspection of the Hotter Facility during the 2018 storm.

He took photos of both the Hotter Facility and the Brown property. Burkman testified that the photos he took of the Brown property didn't show any water on the property. He also explained that, after the September 2008 storm, the City sent out a survey to determine how many residents suffered damage from the stormwater. Of the approximately 1,300 responses received, around 130 residents responded that their basements flooded. William Rensberger, who surveyed the Brown property in 2017, also testified and confirmed the relevant elevations of the Brown property and the Hotter Facility.

[11] David McCormick, a civil engineer specializing in water resources, testified as an expert for the Browns. McCormick prepared two reports analyzing the capacity of the Hotter Facility in relation to the rainfall during the November 1990, July 1996, September 2008, August 2014, and February 2018 storms.[3] Based on the precipitation levels for each storm and the relevant elevations of the Hotter Facility and Brown property, McCormick prepared models of the predicted levels of flooding onto the Brown property during each storm. He opined that overflow from the Hotter Facility will inevitably flood the Brown property during heavy storms that reach a high enough downfall rate.

---

[3] McCormick's first report included the September 2013 storm, but he omitted it from his supplemental report because, based on his modeling, no water from the Hotter Facility would have reached the Brown property. Though the Browns claimed in the Second Complaint and at the bench trial that water from the Hotter Facility flooded their property in September 2013, they no longer include September 2013 as one of the alleged flooding events. *See* Appellants' Br. p. 11.

[12] Jeffrey Vale, a licensed real-estate appraiser, prepared an appraisal of the Brown property. Vale determined that the value of the property before any incursion of water from the Hotter Facility was $275,000. He explained that, if the Browns tried to sell their property, they would have to disclose to any potential buyers the history of flooding in the basement and backyard. Due to this required disclosure, Vale estimated the Brown property was now worth $69,000. He admitted that, in making these conclusions, he assumed that there has been a taking, that the flooding problem can't be solved on the property, and that the data in McCormick's reports is true.

[13] In August 2023, the trial court denied the Browns' inverse-condemnation claim. In its order, the court concluded as follows for each of the alleged flooding events:

> 18. The Court will not consider the 1990 and 1996 water events as evidence of a taking as these events were not presented as evidence of a taking at the 2012 bench trial. Therefore, the Court determines that any evidence of any alleged flooding events prior to 2012, other than perhaps the September 2008 flooding event, will not be considered as evidence since they were not presented at the 2012 bench trial.

> 19. Further, the Court will not consider any evidence of the alleged September 18, 2013, flooding event as the plaintiffs' own expert, David McCormick, testified that no water would have reached any portion of the Brown Property.

> 20. The Court will also not consider the alleged 5-6 events where water receded from the Browns' Property in approximately one (1) day as the only evidence regarding these alleged events came

from testimony of Janet Brown, and the Plaintiffs' own expert, David McCormick, did not consider these 5-6 events in his opinions.

. . . .

27. The Court further determines that the August 20-22, 2014, water event is not to be considered a flooding event, but rather temporary surface water which receded from the Browns' property in 2-3 days.

. . . .

29. The Court further determines that the February 18-21, 2018, water event is not to be considered a flooding event, but rather temporary surface water which receded from the Browns' Property in 2-3 days.

30. The Court determines the only flooding event on the Brown Property since the Hotter Facility construction occurred in the September 2008 event, when a 200-500 years storm occurred which the Hotter Facility was not designed to handle, and even in the September 2008 event, the water was temporary and receded from the Brown property in 2-3 days.

Appellants' App. Vol. II pp. 40-42. That said, the court concluded that even if it were to consider all the alleged flooding events,

[T]he alleged events have only minimally interfered with the Browns temporarily using the northeast portion of their property including the little barn, oak tree garden and vegetable garden for a total of approximately 18-21 days in 35 years. The alleged events have not prevented the Browns from growing grass, maintaining a vegetable garden from 2014-2017, and holding

Easter egg hunts on the northeast portion of their property. . . .
[T]he Browns['] use of their property as a single-family residence
has not been interrupted since 1987, as the Browns have never
moved out of their home and even in the September 2008 storm
event, only the basement was not able to be used temporarily.

*Id.* at 42-43.

[14]    The Browns now appeal.

# Discussion and Decision

## I. Any errors in the trial court's findings of fact are not fatal to the judgment

[15]    The Browns argue several of the trial court's findings of fact are not supported
by the evidence. Where, as here, a trial court enters findings and conclusions
pursuant to Indiana Trial Rule 52(A), we determine (1) whether the evidence
supports the findings and (2) whether the findings support the judgment. *Hurst
v. Smith*, 192 N.E.3d 233, 242 (Ind. Ct. App. 2022). We do not set aside the
findings or judgment unless clearly erroneous. *Id.* "We neither reweigh the
evidence nor assess the credibility of the witnesses but consider only the
evidence most favorable to the judgment." *Id.*

[16]    The Browns challenge Findings 6(h), 8(d), 8(e), 8(h), 8(i), 9(i), and 10(j). First,
we note that these "findings" are mere recitations of witness testimony, not
actual findings of fact. *See In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct.
App. 2003) ("A court or an administrative agency does not find something to be
a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier

of fact must find that what the witness testified to is the fact." (citation omitted)). For such a "finding" to be considered a finding of fact, the trier of fact must adopt the testimony of the witness. *Id.*

[17] Finding 6(h) states: "6. On June 6, 2023, Janet Brown testified to the following: . . . h. Janet Brown agreed that each of the water incidents which occurred since 1987 were temporary events[.]" Appellants' App. Vol. II p. 29. Even though the trial court recited Janet's testimony, it adopted the testimony later in the order, noting several times that the various water events were "temporary." *See id.* at 41-42, 48, 50. Because the trial court adopted the testimony recited in Finding 6(h), we may consider it to be a finding of fact. In addition to Janet's testimony that "[t]he water has been on the property temporarily" during each of the alleged events, Tr. Vol. II p. 111, both Richard and Janet testified about the water receding from their property a couple of days after the events, *see id.* at 44, 69, 96, 102-04. This evidence supports the trial court's finding.

[18] Findings 8(d), (e), (h), and (i) all recite testimony by Burkman:

> 8. On June 7, 2023, Tim Burkman testified to the following:
>
> > d. After the September 2008 storm event, the City sent out a survey in November 2008 to its residents and received around 1300 responses;
> >
> > e. Out of the 1300 responses received by the City to the November 2008 survey, approximately 130 people identified that they received water inside their basement

> causing damage as a result of the September 2008 storm event;
>
> . . . .
>
> h. The 2014 picture of water in the Browns' backyard (Def.'s Ex. E) does not show any water from the Hotter facility coming onto the Brown property;
>
> i. The pictures taken by Mr. Burkman on February 20, 2018, (contained in Def.'s Ex. G) show no water on any portion of the Brown property[.]

Appellants' App. Vol. II pp. 31-32. The trial court adopted this testimony in Conclusions 39, 24, and 25, respectively, *see id.* at 41, 43, so we may consider these as findings of fact.

[19] The Browns' argument about Findings 8(d) and (e) is that their property was the only property flooded by backwater from the Hotter Facility during the September 2008 storm. *See* Appellants' Br. p. 31. But Findings 8(d) and (e) say nothing about whether other residents' water damage from the storm was caused by the Hotter Facility; they simply explain that the City sent a survey to its residents and what responses it received, which is supported by Burkman's testimony. The Browns don't identify any evidence to the contrary and don't deny that the City sent out a survey or dispute the responses. The Browns' challenge to these findings lacks merit.

As to Finding 8(h), the Browns acknowledge that the only evidence suggesting the water shown in Exhibit E came from the Hotter Facility is Richard's and Janet's own testimony. The trial court had the opportunity to hear this testimony and view the photo and evidently did not believe the Browns. Because we do not reweigh the evidence or judge witness credibility, we will not second guess this determination.

In challenging Finding 8(i), the Browns don't argue that the photos Burkman took in 2018 show water on their property but inexplicably cite to other evidence in the record about the 2018 storm. Finding 8(i) is merely about what the photos in Exhibit G show. Burkman testified that the photos don't show any water on the Brown property. *See* Tr. Vol. II pp. 182-84. This testimony supports the trial court's finding.

Finally, Findings 9(i) and 10(j) state Rensberger and McCormick each testified that "[d]uring any type of precipitation event, rain falling on the Brown Property naturally gathers on the northeast portion of the property." Appellants' App. Vol. II pp. 32, 34. Along with the fact that these statements are not proper findings as explained above, neither Rensberger nor McCormick testified about whether or where rain "naturally gathers" on the Brown property. Thus, these "findings" are erroneous. But "even an erroneous finding is not fatal to a trial court's judgment if the remaining valid findings and conclusions support the judgment, rendering the erroneous finding superfluous and harmless as a matter of law." *Curley v. Lake Cnty. Bd. of Elections & Registration*, 896 N.E.2d 24, 32 (Ind. Ct. App. 2008), *trans. denied*. As we explain

below, the valid findings and conclusions support the trial court's denial of the Browns' inverse-condemnation claim. Although erroneous, Findings 9(i) and 10(j) are not fatal to the judgment.

## II. The trial court's judgment is not contrary to law

[23] The Browns contend the flooding of their property by water overflowing from the Hotter Facility is a permanent per se taking. Because the Browns had the burden of proof at trial, they are appealing from a negative judgment. *See Burnell v. State*, 56 N.E.3d 1146, 1149-50 (Ind. 2016). A party who appeals from a negative judgment will prevail only if they establish that the judgment is contrary to law. *Cnty. of Lake v. Pahl*, 28 N.E.3d 1092, 1099 (Ind. Ct. App. 2015), *trans. denied*. In determining whether the trial court's judgment is contrary to law, we consider the evidence in the light most favorable to the appellee, together with all reasonable inferences therefrom, and we do not reweigh the evidence or judge witness credibility. *Burnell*, 56 N.E.3d at 1150. A judgment is contrary to law only when the evidence is without conflict, and all reasonable inferences to be drawn from the evidence lead to only one conclusion, yet the trial court reached a different conclusion. *Cnty. of Lake*, 28 N.E.3d at 1099.

[24] Both the United States and Indiana Constitutions require just compensation where the government takes private property for public use. *Murray v. City of Lawrenceburg*, 925 N.E.2d 728, 731 (Ind. 2010). If the government seizes property for a public purpose but fails to initiate eminent-domain proceedings,

the "person having an interest in [the] property" may bring suit to recover damages under the eminent-domain statutes. Ind. Code § 32-24-1-16. Cases brought under Section 32-24-1-16 are known as inverse-condemnation actions. *State v. Dunn*, 888 N.E.2d 858, 861 (Ind. Ct. App. 2008), *trans. denied*.

[25] An action for inverse condemnation requires "(1) a taking or damaging; (2) of private property; (3) for public use; (4) without just compensation being paid; and (5) by a governmental entity that has not instituted formal proceedings." *Murray*, 925 N.E.2d at 731. A taking by inverse condemnation includes any "substantial interference with private property which destroys or impairs one's free use and enjoyment of the property or one's interest in the property." *Sloan v. Town Council of Patoka*, 932 N.E.2d 1259, 1262 (Ind. Ct. App. 2010). Whether the interference is substantial is a question of fact for the factfinder. *Id.* One who suffers a "mere inconvenience" likely possesses an extraordinarily weak takings claim. *Id.*

[26] It is well established that government-induced flooding may constitute a taking. *Town of Linden v. Birge*, 204 N.E.3d 229, 231 (Ind. 2023).[4] Our analysis of a flooding-related takings claim depends on the duration of the flooding. If the flooding is temporary or of "finite duration," we consider the factors set forth in *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012): "(1) the duration of the interference, (2) the degree to which the invasion is intended or

---

[4] *Town of Linden* was decided on March 7, 2023, three months before the bench trial in this case.

is the foreseeable result of authorized government action, (3) the character of the land at issue, (4) the owner's reasonable investment-backed expectations regarding the land's use, and (5) the severity of the interference." *Id.* at 233, 235. On the other hand, "if the flooding is continuous or 'intermittent but inevitably recurring,' and the invasion is 'substantial,' then it results in a *per se* taking." *Id.* at 235.

[27] In its order denying the Browns' inverse-condemnation claim, the trial court applied the *Arkansas Game* factors.[5] The Browns maintain that *Town of Linden* applies because the flooding from the Hotter Facility is intermittent and will inevitably recur. They allege they have experienced five "major" flooding events (November 1990, July 1996, September 2008, August 2014, and February 2018) and six "lesser" events on their property since construction of the Hotter Facility in 1987. Appellants' Br. p. 11. But even if we take all these alleged events as true, under the *Town of Linden* standard, there has not been substantial damage to or interference with the Brown property.

[28] The only damage the Browns allege as a result of the flooding is a decrease in their property value. Vale estimated that before any flooding, the Browns'

---

[5] The Browns challenge Conclusions 34, 35, 57, and 63 on the ground that the trial court improperly imposed an element of intent. While the Browns are correct that there is no requirement that the City intended for water to flood their property, none of the trial court's conclusions suggest that intent was required to show substantial damage such that a taking occurred. It appears the trial court was merely considering intent as one of the *Arkansas Game* factors. The Browns contend the trial court's failure to apply the *Town of Linden* standard is reversible error, but because the trial court still included the substantial-interference analysis recognized in *Town of Linden*, *see* Appellants' App. Vol. II pp. 42, 44-45, 50, this is not a ground for reversal.

property would've been worth $275,000. He opined that because the Browns will have to disclose to potential buyers the historical flooding of their property and home, the value is now $69,000. That said, he acknowledged he made these calculations assuming that all the conclusions and data in McCormick's reports were true, that the flooding problem can't be solved on the property, and that there had, in fact, been a taking. Without acknowledging Vale's projection, the trial court concluded there was no substantial interference with the Brown property, and thus no taking. Evidently, after hearing Vale's testimony, the trial court was not persuaded by his predictions. Because we do not reweigh the evidence or judge witness credibility, we will not give more weight to Vale's testimony than the trial court did. *See Burnell*, 56 N.E.3d at 1150.

[29] The rest of the evidence does not rise to the level of substantial damage or interference either. The only time water entered the Brown's house was during the 200- to 500-year storm in September 2008. And while that flood damaged the house, it was already found insufficient to amount to a taking by the trial court in the First Complaint. *See* Ex. Z. During the rest of the alleged flooding events, water merely gathered and pooled in the Browns' backyard. By the Browns' own account, during the "major" flooding events, the water remained on their property for around two to three days. The only interference the Browns alleged as a result of these events is that they'd have to wait to mow the lawn when it was wet and that Janet had to delay a trip by a few days because of the February 2018 storm. They admitted the flooding hasn't kept them from

maintaining their garden or hosting their annual Easter egg hunt in the backyard. And the Browns have remained in their home continuously since the Hotter Facility was constructed, even through the September 2008 storm.

[30] Assuming without deciding that all the alleged flooding events occurred and were caused by overflow from the Hotter Facility, the evidence does not show substantial impairment of the Browns' free use and enjoyment of their property or of their interest in the property. At most, the Browns were temporarily inconvenienced during the few days the water was on their property during each event, "for a total of approximately 18-21 days in 35 years." Whether this amounted to substantial interference was a question for the trial court as the factfinder, and the trial court concluded it did not.[6] Considering the evidence in the light most favorable to the City, we agree with the trial court that, at worst, the alleged flooding events have "only minimally interfered" with the Browns' use of their property. The trial court's judgment is not contrary to law.

[31] Affirmed.

May, J., and Kenworthy, J., concur.

---

[6] The Browns also raise several challenges to the trial court's conclusions on which alleged flooding events it would consider. Because we find that, even considering all the alleged flooding events, there has been no substantial interference with the Brown property, we do not address these challenges.

ATTORNEYS FOR APPELLANTS

Robert A. Welsh
Connor H. Nolan
Harris Welsh & Lukmann
Chesterton, Indiana


ATTORNEY FOR APPELLEE

Jeffrey S. Wrage
Blachly, Tabor, Bozik & Hartman, LLC
Valparaiso, Indiana